Imogene WILLIAMSON, Executrix of the Estate of Mary Ann MERRITT *v.* James Clyde MERRITT II & Michael Wheatly MERRITT

74-235                                              519 S.W. 2d 767

Opinion delivered January 20, 1975
[Rehearing denied March 24, 1975.]

*Imogene Williamson,* for appellant.

*Botts & Jenkins,* for appellees.

LYLE BROWN, Justice. The sole issue is whether the withdrawal by the testatrix from a savings account willed to appellees showed an intention to revoke the legacy as to the funds withdrawn. The trial court, upon stipulated facts, held there was no such ademption. The appellant is Imogene Williamson, executrix of the estate of Mary Ann Merritt. The appellees are James Clyde Merritt II and Michael Wheatley Merritt, who were designated in the will to receive the proceeds in the savings account.

On January 26, 1965, Ms. Merritt, the testatrix, deposited in the First Federal Savings and Loan Association of Stuttgart, Arkansas, $6,170.05. The account was in the names of "Miss Mary Merritt and James Clyde Merritt and Mike Wheatly Merritt". There was this written entry: "No withdrawals made without the signature of Miss Merritt. Payable upon her death to James and Mike equally." The initial deposit was the only one made. By the time of her death Ms. Merritt had, by withdrawals, reduced the savings account to $2,376.68.

Ms. Merritt executed a will on February 12, 1972. Among other things it provided: "I give, devise and bequeath to James Clyde Merritt II and Michael Wheatly Merritt my savings account in First Federal Savings and Loan Ass'n of Stuttgart, Ark." The will further directed that the residuary estate be divided equally among nine grandnieces and grandnephews including James and Michael.

On May 1, 1972, by letter, the testatrix gave this directive to First Federal: "Make a transfer in the amount of $3,-000 to the account of Miss Mary Merritt, First National Bank, DeWitt, Arkansas" for "the purpose of taking care of medical expenses for myself". At that time Ms. Merritt had a checking account at First National and the $3,000 was commingled with $518.78 already in that account. Before her death on May 21, 1972, Ms. Merritt wrote two checks on the account, those checks totaling $69.86.

In the situation before us, we look to the intent of the

testatrix. Generally, the courts look with disfavor upon the ademption of a specific legacy; however, "In construing a will to determine whether there has been an ademption of a specific legacy, the intention of the testator is the controlling factor, the same as in the construction of all wills. Once the intention of the testator has been determined, all other rules of law pertaining to ademption must bend to such intent, so long as his intent does not violate some positive rule of law." *In Re Estate of Brown*, 252 N.E. 2d 142 (Ind. 1969). In *Brown*, the testator willed to his sister-in-law all his rights and title which testator had received from the estate of his deceased brother. Before his death the testator purchased bank certificates with the money obtained from his brother's estate. The certificates were held intact until testator's death. The court held there was no ademption.

Looking at the will itself and all other relevant facts and circumstances occurring between the execution of the will and the death of the testatrix, we have concluded there was an ademption. The wording of the will is of no substantial significance on the point in question. However, it should be noted that the will did not "freeze" the savings account at any specific sum. For example, that was the situation in the case cited by appellee — *Prendergast* v. *Walsh*, 42 Atl. 1049 (N. J. 1899). In *Prendergast*, the testatrix bequeathed "whatever of my money *now* on deposit" (our emphasis) in four named banks to "my beloved sisters". The money was subsequently withdrawn from the four banks and deposited in another bank. There were no withdrawals. Oral testimony was admitted to show that testatrix moved the money because she thought it would be safer. In that situation the court held there was no ademption.

Upon the opening of the savings account Ms. Merritt made it clear that as long as she lived she held the exclusive right to control withdrawals. As previously stated she had the entry made that no withdrawals would be made without her signature. She did in fact make several withdrawals to the exclusion of all other people. In fact she treated the account as being little more than a checking account. Up until the withdrawal of the $3,000 she had made numerous withdrawals, all of which amounted to $2,599.04.

When Ms. Merritt withdrew the $3,000 from savings she left a tidy balance on savings. By placing the $3,000 in an existing checking account and commingling it with other funds the indication is strong that she no longer wanted the $3,000 to remain a part of her special bequest to James and Michael. In fact she dedicated the funds to her personal needs. The fact that she did not live long enough to expend the funds is not important.

It is also of some significance that the bequest of the savings account was in general terms — "my savings account — rather than naming a specific amount.

Appellee cites *Willis* v. *Barrow,* 119 So. 678 (Ala. 1929). But the facts are different from our case. In *Willis,* money on deposit in a named bank was bequeathed. The money thereafter was transferred to another bank; however, it was placed in a separate savings account rather than commingled with another savings deposit in the same bank. "Significant is the fact that the identical fund was put in a separate savings deposit rather than being commingled with a like savings deposit then in the same bank."

Appellee also cites *In Re Estate of Hall,* 160 Atl. 2d 49 (N.J. 1960). Hall, the testator, had money in four banks in Rochester, New York, which he bequeathed to designated relatives. After the execution of the will Hall moved to Maplewood, New Jersey, and he transferred the funds in the four banks to a bank, and a savings and loan association in Maplewood. It was agreed that the funds in the latter account could be directly traced as coming from the banks in Rochester. There was no evidence of commingling of the transferred funds with other funds. The court held it to be obvious that the transfer was purely one of convenience. The court interpreted the will to mean that the testator desired that a grandnephew, Harknett, receive only a nominal sum from his estate. If it held (the court continued) there was an ademption Harknett would receive a substantial sum of money contrary to the wishes of the testator. So we do not think the facts in Hall help in the solution of the problem before us.

Of course appellees are entitled to the balance in First

Federal; however, the $3,000 withdrawn from First Federal was adeemed and therefore becomes a part of the residual estate.

Reversed and remanded.

HARRIS, C.J., and HOLT, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I very much disagree with the majority opinion for two reasons. For one (recognized by the majority), the law looks with disfavor upon the ademption of a specific legacy, and secondly, I cannot agree that the fact situation herein denotes an intent upon the part of Ms. Merritt to revoke the legacy to the two nephews. In the case of *In Re Estate of Brown,* 252 N.E. 2d 142 (Ind. 1969), cited in the majority opinion,[1] there is a thorough discussion of the subject under consideration and the court sets out the law on ademption clearly and definitely as follows:

> "The courts look with disfavor upon the ademption of a specific legacy and will not approve of such an ademption unless the facts and circumstances of the particular case unmistakenly demand such a result.

> "It is only when the subject matter of the specific legacy has been completely destroyed, alienated or extinguished, or so changed in character that it cannot be recognized or identified, that the legacy will be adeemed. But where the subject matter of the specific legacy has not been completely destroyed, alienated or extinguished, but merely changed in form, shape or location, by accident, operation of law, or some act of the testator, *and such subject matter in its changed or altered form can be traced into the possession of the testator, and is a part of his estate as the time of his death, and the attitude of the testator toward such altered property has been such as to indicate no*

---

[1] The majority cite this case and correctly state its holding, which is entirely contrary to the majority view taken in the instant litigation; no effort, however, is made by the majority to distinguish *Brown* from the case now before us, and it is noticeable that the holding there went beyond the holding of the chancellor in the case before us, in that in *Brown* the money at issue had been converted to bank certificates.

*change in his testamentary intent, there is no ademption and the legatee will take such property in its altered form."* [My emphasis].

In *Mee v. Cusineau, Executrix,* 213 Ark. 61, 209 S.W. 2d 445, we pointed out the circumstances under which an ademption will occur, and as will be subsequently shown, these circumstances are not present in the instant case. In *Mee* this court said:

> "At § 341, 28 R.C.L. 345, appears statements of the law to the following effect. The distinctive characteristic of a specific legacy is its liability to ademption. *If the identical thing bequeathed is not in existence, or has been disposed of so that it does not form a part of the testator's estate, at the time of his death, the legacy is extinguished or adeemed, and the legatee's rights are gone.* [My emphasis]. The rule is universal that in order to make a specific legacy effective the property bequeathed must be in existence and owned by the testator at the time of his death, and the nonexistence of property at the time of the death of a testator which has been specifically bequeathed by will is the familiar and almost typical form of ademption. [Citing cases]. ***

> "The reason for this rule as stated in the numerous cases cited in the note to § 543, 68 C.J. 844, is that as the testator no longer owns the property specifically devised, there is no property for the devisee to take, and also that subsequent conveyance of the property by the testator after having made a specific devise of it indicates conclusively a change of testamentary intent as to that property."

The majority also mention the case of *Prendergast v. Walsh,* 42 A. 1049 (N.J), cited by the appellees, but, in my opinion, do not satisfactorily distinguish that case from the one at hand. In *Prendergast,* the testatrix left a bequest of money to her three sisters, or their survivors, "whatever of my money now on deposit in four banks in New York City (naming them) which may be on hand, and not otherwise disposed of, share and share alike." During her lifetime, the testatrix

withdrew the money from the four New York banks and deposited same in another bank, where it remained until her death. The court, holding there was no ademption, *inter alia,* said:

> "The thing she bequeathed, she drew from the bank. It remained the identical thing bequeathed, until disposed of in some way by her. She could have disposed of it by consuming it in living, or turning it into other property, or devoting it to a purpose inconsistent with the bequest. She did neither of these things, but, on the contrary, took the specific thing which she got from the bank, and kept it until April 1st following, and then, with a slight addition, placed it in the Hoboken Bank. While by this deposit in this last-named bank she lost the right to have the same money again in specie, she retained the right to have it as money or cash. If thereafter it was properly designated as money or cash, it must be regarded as a part of the same cash which she had taken from the four banks. If the money remained practically the same money, then the removal of it from the place of its deposit did not amount to an ademption. The place of deposit was merely used as descriptive of the thing bequeathed. It was used to identify the particular money given, and it is entirely settled that, where the place is merely descriptive, the removal of the things to another place is immaterial."

Numerous other cases are to the same effect.

It is apparent that the law strongly looks with disfavor upon an ademption, and if the legacy can be traced and clearly identified and the attitude of the testator toward such altered property has been such as to indicate no change in the testamentary intent, there is no ademption.

Accordingly, the question in this litigation, to which the majority agree, is whether Mary Ann Merritt indicated an intention to revoke the legacy of the two nephews. I contend that there is absolutely nothing in this record — not a single fact — to indicate in any way that Ms. Merritt had any intention to revoke such legacy. In withdrawing the money from

the savings and loan association, and depositing it into her checking account, Ms. Merritt specifically and clearly gave her reason for doing so, "the purpose of taking care of medical expenses for myself." In other words, it is obvious that the testatrix, whose checking account only consisted of $518.78, contemplated that she would need to expend additional funds for medical expenses, and withdrew the money from the savings and loan account and placed it in her checking account solely for that purpose. This is not unusual, and is done every day by those who are required to live on their savings. She was withdrawing this money *for her own use* and not for the purpose of leaving it to some different legatee. Of course, if the money was not placed in a checking account, but instead retained at her home, her future expenses could only have been paid in cash and this could hardly be considered practical.

The majority indicate that there is significance in the fact that Ms. Merritt deposited the money withdrawn from the savings account in the checking account that she already maintained, rather than setting it up in a separate account.[2] I cannot attach any importance to this fact. Why should Ms. Merritt, whose *only purpose* in withdrawing the money from the savings account was to place such money in a location where she could write checks for her medical expenses, open a separate checking account when she already had one? To me, this would be ridiculous.

Succinctly stated, the facts reflect that this withdrawal of funds from the savings and loan association was not occasioned by any change in testamentary intent — but rather (according to her own written statement) was occasioned by her expectation that she would need the money withdrawn for her own personal use.

---

[2]From the majority opinion:
"In *Willis*, money on deposit in a named bank was bequeathed. The money thereafter was transferred to another bank; however, it was placed in a separate savings account rather than commingled with another savings deposit in the same bank. 'Significant is the fact that the identical fund was put in a separate savings deposit rather than being commingled with a like savings deposit then in the same bank.' "

There is another fact which I consider quite pertinent, and that is that Ms. Merritt's Will was executed on February 12, 1972, and her death occurred on May 21, 1972, only slightly more than *three months* after execution of the Will.

To summarize, the depository was changed because Ms. Merritt could not write checks on the money in its original depository. As in *Brown,* the money can easily be traced into the possession of the testator and was a part of her estate at the time of her death; as in *Prendergast,* it was not disposed of by her, was not even used for the purpose of turning it into other property, and was not, in my view, set apart for a purpose inconsistent with the bequest.

I, therefore, respectfully dissent to the holding of the majority.

HOLT, J., joins in this dissent.